IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LEONA TEEL, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 13-1609-RGA |
| | : |
| CAROLYN COLVIN, Acting | : |
| Commissioner of Social Security | : |
| | : |
| Defendant. | : |

## **MEMORANDUM OPINION**

---

Leona Teel, Newark, Delaware. *Pro se* Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware, and Heather Benderson and Patricia A. Stewart, Special Assistant United States Attorneys, Office of the General Counsel Social Security Administration. Counsel for Defendant.

---

Dated: December 4, 2014
Wilmington, Delaware

_Inhard G. Andrews_
**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Plaintiff Leona Teel appeals the denial of her applications for disability insurance benefits under Title II, and supplemental security income benefits under Title XVI, of the Social Security Act. *See* 42 U.S.C. §§ 401-434, 1381-1383f. Jurisdiction exists pursuant to 42 U.S.C. § 405(g). Pending before the Court are cross-motions for summary judgment filed by Teel and Carolyn W. Colvin, Acting Commissioner of Social Security. (D.I. 15, 17). For the reasons set forth below, the Court will grant Teel's motion for summary judgment, will deny the Commissioner's motion for summary judgment, and will remand the matter for further proceedings.

## I.    Procedural History

Teel filed applications for DIB and SSI on November 3, 2009, alleging disability as of August 21, 2008 due to right knee arthritis, back pain, post traumatic stress disorder, and depression. Her claim was denied initially and upon reconsideration. A hearing was held on October 14, 2011, before an Administrative Law Judge who denied Teel's application for benefits. The Appeals Council declined to overturn that decision, and it became the final order of the agency. Teel filed the instant complaint seeking judicial review of the ALJ's decision. (D.I. 2). Teel seeks a finding of disability, and the Acting Commissioner asks that the Court affirm the decision to deny benefits.

Teel had counsel during the October 14, 2011 hearing. She does not have counsel now, and therefore proceeds *pro se* in this Court.

## II.    Medical Evidence

### A.    Mental

Teel received treatment from Dr. Joanne Lundholm for a depressive disorder beginning in October 2007. Dr. Lundholm  prescribed various medications including Paxil, Xanax, and

Buspar, and referred Teel for counseling in February 2008.[1] (D.I. 12 at 404-06, 419, 435-42). As of August 8, 2008, Teel was doing well and taking only one Xanax per day. (*Id.* at 404). On examination, Teel was cooperative and well groomed, oriented with appropriate mood and affect, able to articulate well with normal speech/language, rate, volume, and coherence, with no evidence of hallucinations. (*Id.*).

When Teel was seen by certified registered nurse practitioner Stacey Graves on September 16, 2008, she stated that she was depressed, and that she was seeing a counselor for posttraumatic stress disorder related to the recent death of her son. (*Id.* at 408). Teel was taking Buspar with some relief, but was still frequently sad and tearful. (*Id.*). Teel was appropriate, but tearful, when speaking about the death of her son. (*Id.*). On examination, Teel was oriented with appropriate mood and affect and able to articulate well with normal speech/language, rate, volume, and coherence. (*Id.* at 410). Her thought content was normal with the ability to perform basic computations and apply abstract reasoning. (*Id.*). There was no evidence of hallucinations, delusions, obsessions, or homicidal/suicidal ideation. (*Id.*). Teel demonstrated appropriate judgment and insight, intact memory, and her attention span and ability to concentrate were normal. (*Id.*) Teel was prescribed Clonazepam. (*Id.*)

When Teel saw Dr. Muhammed A. Niaz from February 2009 through November 2009, he made diagnoses of bipolar affective disorder, depressive disorder, and anxiety/panic disorder. (*Id.* at 503-15). Dr. Niaz prescribed Klonopin and Buspar. In January 2010, Dr. Niaz referred

---

[1]Teel was seen by Dr. Lundholm on a fairly regularly basis: October 30, 2007, December 7, 2007, December 28, 2007, February 20, 2008, June 10, 2008, July 9, 2008, and August 8, 2008.

2

Teel to a psychiatrist for her unresolved grief. (*Id.* at 546). In April 2010, Teel began treatment at Harmonious Mind Psychiatric and Counseling Services. (*Id.* at 549).

On April 13, 2010, Teel underwent a psychological functional capacities evaluation by Brian Simon, Psy.D. (*Id.* at 526-32). His diagnostic impression was major depressive disorder, recurrent, severe with psychotic features; rule out personality disorder, not otherwise specified; numerous medical problems by self-report; occupational problems, problems with primary support group; and a GAF of 50. (*Id.* at 531). The prognosis was guarded, with Dr. Simon stating that much of Teel's prognosis was dependent on how well she was able to continue to cope with her psychiatric and medical problems. (*Id.*)

Dr. Simon opined that Teel had a mild impairment in her ability to relate to other people, a moderate restriction in her activities of daily living, a moderately severe deterioration in her personal habits, and a moderately severe constriction of interests. (*Id.* at 526). He found that Teel had a moderate impairment in her ability to understand simple, oral instructions, and a moderately severe impairment in her ability to carry out instructions under ordinary supervision, sustain work performance and attendance, cope with pressures of ordinary work, and perform routine, repetitive tasks under ordinary supervision. (*Id.* at 527).

Dr. Simon reported that Teel appeared to be a poor historian, and he found her minimally disheveled, quite frantic, and hysterical during the evaluation. (*Id.* at 528, 530). Teel informed Dr. Simon that she was applying for disability benefits due to depression resulting from the death of her sixteen year old son, who had died two years earlier from a staph infection. (*Id.* at 28). She cried incessantly and looked around the room a lot, reported being uncomfortable in public, but was able to make good eye contact. (*Id.* at 530). Teel's attention and concentration were fair

3

to poor; her speech was normal in rate and volume but was limited to brief responses; and she did not show articulation problems. (*Id.*). Teel was oriented with good immediate memory, but poor short-term memory. (*Id.*). Her mood was depressed and her affect was labile. (*Id.*). Teel reported having nightmares, but denied feeling suicidal or homicidal. (*Id.*). Dr. Simon considered Teel's judgment and insight fair to poor. (*Id.*). Dr. Simon concluded that Teel's presentation suggested that her psychiatric problems would adversely affect her ability to make decisions, adapt to different circumstances, and exercise judgment, insight, and common sense at work. (*Id.*). He opined that she may have problems interacting appropriately with others and performing simple tasks and avoiding hazards. (*Id.*).

A state agency consultant – Janet S. Brandon, a psychologist – performed a mental residual functional capacity assessment on April 27, 2010. (D.I. 11 at 150-81). She determined that Teel had mild restrictions of activities in daily living, moderate difficulties in maintaining social functioning, concentration, persistence or pace, and that there were no episodes of decompensation. (*Id.* at 158-59). The state agency consultant determined that Teel was not significantly limited in her ability to work in coordination with or in close proximity to others without being distracted, that she did not have any social interaction limitations, and that she did not have any adaptation limitations. (*Id.* at 163). She found that Teel's prolonged grief had interfered with focus at times. (*Id.*). The state agency consultant found that Teel was able to perform simple tasks from a mental standpoint. (*Id.*).

Teel was seen at Harmonious Mind on a regular basis from July 2010 through June 2011. (D.I. 12 at 692-727). She was prescribed various medications including Cymbalta and Lamictal. As of June 6, 2011, Teel was well oriented and alert with a dysphoric and tearful affect. (*Id.* at

4

699). She had a depressed mood; fair eye contact; excessive speech; normal memory; normal psychomotor activity; a negligible degree of conceptual disorganization evident; and her thought process was characterized by a preoccupation with illness and grieving. (*Id.*). Teel had no suicidal or homicidal ideations. (*Id.*). On June 30, 2011, Teel reported to Harmonious Mind personnel that she was having a difficult time (*id.* at 701), but by July 26, 2011, Teel reported that she was having "more good days than bad" and she was less tearful and better kempt. (*Id.* at 702). Diagnoses at that time included major depressive disorder, recurrent, severe with psychotic features, without full interepisode recovery, mood disorder NOS (R/O), panic disorder without agoraphobia, bereavement, and post traumatic stress disorder (principal). (*Id.* at 701).

## B.    Physical

Teel presented to Bert M. Bieler, M.D. on October 12, 2007, with complaints of back pain. (*Id.* at 443). Teel stated that she managed her back pain during her recent pregnancy with Percocet, and that she was feeling well and had no symptoms of depression. (*Id.* at 443-44). Dr. Bieler prescribed Tramadol and instructed Teel to follow up with Dr. Lundholm. (*Id.* at 444). Teel saw Dr. Lundholm from December 2007 through August 2008 for back pain and knee pain.[2] (D.I. 11 at 394; D.I. 12 at 404-06, 431-40). Dr. Lundholm prescribed pain medication including Percocet, diagnostic testing including an MRI of the lumbar spine, and physical therapy. As of June 10, 2008, Teel indicated that her back pain was better, but she had episodes of pain and was looking for a pain doctor. (D.I. 12 at 405). Upon examination, Teel's back had some paraspinous spasm bilaterally, she had a negative straight leg-raising test, and her gait was within

---

[2]Teel was seen by Dr. Lundholm on December 7 and 28, 2007, February 20, 2008, April 2, 2008, June 10, 2008, and August 8, 2008.

normal limits. (*Id.* at 406). Teel began physical therapy in August 2008 for low back pain. (*Id.* at 404).

Teel was seen by Jie Zhu, M.D. on September 16, 2008, for pain management of her neck and lower back. (D.I. 11 at 395). Teel provided a history of chronic neck and back pain for over five years after falling down stairs, that physical therapy, Motrin and/or Naprosyn failed to relieve the pain, and that she was taking Percocet. (*Id.*). Examination of the neck revealed a normal range of motion, and a negative Spurling's maneuver with mild to moderate tenderness. (*Id.* at 396). Examination of the lower back revealed mild, diffuse tenderness. (*Id.*). Examination of the upper and lower extremity indicated that deep tendon reflexes were symmetrical, and manual muscle testing was grossly intact. (*Id.*). Teel had normal range of motion in all extremities, straight leg raising test was negative, there was full muscle strength in the upper and lower extremities, and normal muscle tone. (*Id.* at 396-97). Dr. Zhu diagnosed radicular syndrome of lower limbs, chronic pain syndrome, low back pain, neck pain, myalgia, cervical spondyloarthritis, spondylosis, and injury of lumbar nerve roots. (*Id.* at 397). He prescribed Neurontin and Darvon, and ordered an MRI of the spine and an EMG of the right lower extremity. (*Id.*).

Teel saw Dr. Niaz in October, November, and December 2008. He diagnosed Teel with backache, fibromyalgia, and ambulatory dysfunction, changed the doses and frequency of some medications and prescribed Oxycodone. (*Id.* at 517-20). A January 13, 2009 x-ray of Teel's lumbar spine was normal, and a February 12, 2009 x-ray of Teel's right knee revealed mild osteoarthritic changes, with no acute abnormality. (*Id.* at 401, 403, 551). On February 24, 2009, Dr. Niaz diagnosed ambulatory dysfunction, and arthritis, and he ordered an MRI of the right

6

knee. (*Id.* at 515). A March 18, 2009 MRI of the right knee revealed no tear in the menisci, ligaments, or tendons, but hypertrophic degenerative changes of the femorotibial and femoropatellar joints and a moderate amount of joint fluid. (D.I. 11 at 399). The March 18, 2009 MRI of the lumbar spine revealed disc desiccation with mild disc bulging, peripheral annular tear at L5-S1, but no distinct focal disc herniation. (*Id.* at 400).

Teel continued to see Dr. Niaz from April 2009 through April 2010. (D.I. 12 at 505-520). He diagnosed arthritis and backache, encouraged Teel to increase her exercise, and make healthy diet choices. He ordered diagnostic testing including an x-ray of the sacroiliac joint. He prescribed several medications including Levaquin, Soma, and Oxycodone. In addition, he ordered a knee brace. In January 2010, Dr. Niaz began the process for Teel to undergo breast reduction. (*Id.* at 764-68). In late January 2010, Shantal Fagan, Teel's sister, completed a function report. (D.I. 11 at 334-41).

A February 14, 2010 x-ray of the left shoulder was normal. (D.I. 12 at 521). On February 19, 2010 Teel saw Dr. Niaz, and, on March 3, 2010, Teel saw E. Dale LaTonn, M.D. after a door fell on Teel, injuring her left shoulder; the next month, Teel began an eight-week physical therapy program for her shoulder. (*Id.* at 523, 564, 645, 647, 649, 761-63, 775). Teel saw Dr. Niaz on March 12, 19, and April 16, 2010, before she returned to Dr. LaTonn on May 3, 2010 with knee complaints that the pain had worsened and there was stiffness in the right knee with weather changes. (*Id.* at 561, 753-60).

Irwin Lifrak, M.D. performed a consultative examination of Teel on May 6, 2010. (*Id.* at 535). On examination, Teel walked without the aid of any assistive device but her gait exhibited a mild degree of limp favoring the right leg. (*Id.* at 537). Teel was able to get on and off the

7

examination table without assistance, and could perform maneuvers of the hands requiring dexterity, such as picking up coins and paperclips with either hand without difficulty, but she was unable to walk on her heels or toes. (*Id.*). Teel had no gross deformities in her extremities and there was no evidence of cyanosis or clubbing of the digits. (*Id.*). No asymetrical muscle atrophy or wasting was seen; there was no evidence of joint effusion; and her grip strength and muscle tone was 5/5. (*Id.*). Dr. Lifrak determined that within an eight-hour workday, Teel could walk distances up to one block, climb stairs on a limited basis, sit for five to six hours, and stand for four hours. (*Id.* at 538). He opined Teel could lift up to ten pounds with either hand. (*Id.*).

A State agency consultant – Dr. Jose Acuna – completed a residual functional assessment on June 8, 2010. He concluded that Teel could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for four hours; sit about six hours in an eight hour day; that she was limited in pushing and/or pulling in her right lower extremities; and that she had some postural limitations. (*Id.* at 161-62).

Teel underwent a bilateral breast reduction on May 11, 2010. (D.I. 12 at 744, 750). She was seen by Dr. Niaz on May 14, and June 10 and 24, 2010. (*Id.* at 744-50). In August 2010, the Maryland Pain Institute prescribed Lyrica and continued Teel on Oxycodone. (*Id.* at 571). On August 27, 2010, Teel renewed the eight-week physical therapy program for her shoulder. The April 2010 physical therapy session had provided Teel with moderate pain relief. (*Id.* at 618). Teel stated that the pain had increased over the previous two months, and she complained of increased pain and limitation with housework, lifting, overhead movement, and when lying on her left side. (*Id.*).

8

Teel was seen at the Pain Institute in September and October 2010 for lower back pain, lumbar facet syndrome, and leg pain. (*Id.* at 569-70). The Pain Institute increased Teel's dosage of Lyrica, continued her on Oxycodone, and planned to schedule a lumbar facet block. (*Id.* at 570). On October 8, 2010, Teel reported to her physical therapist that her shoulder was feeling better, and a few days later she indicated there was mild improvement of her shoulder range of motion and pain. (*Id.* at 580, 583).

Teel was seen by Peter B. Bandera, M.D. for neck, back, and shoulder pain in October and November 2010, and in February and April 2011. (*Id.* at 666-67, 671). When Dr. Bandera first saw Teel, he diagnosed traumatic cervical/lumbar syndrome with strain/sprain and radiculopathy features, as well as left shoulder strain/sprain/impingement, and he planned to continue her on physical therapy with medication support. (*Id.* at 671). On November 17, 2010, Dr. Bandera reported Teel had a stable therapeutic affect on Oxycodone and Flexeril. (*Id.* at 670).

A March 2011 MRI of Teel's shoulder revealed minor peritendinitis of the supraspinatus tendon, and an MRI of the right knee revealed a small truncation defect/tear involving the femoral articular portion of the lateral meniscus, joint effusion, and chronic mediocollateral ligament sprain. (*Id.* at 661-62). In April 2011, Dr. Bandera evaluated Teel and found spasm and muscle guarding in her neck, back, and left upper extremity/shoulder with impingement features. (*Id.* at 666). Teel had a positive Spurling's maneuver, but a negative straight leg-raising test. (*Id.*). Teel had pain on terminal extension of the neck and back with associated pain on facet loading lumbar spine. (*Id.*).

9

On March 7, 2011, Teel presented to Frank Falco, M.D. for chronic pain syndrome in the shoulder, right knee, and low back. (D.I. 12 at 654). Teel reported trouble sleeping. (*Id.*). Dr. Falco referred to 2009 test results and ordered MRIs of Teel's right shoulder, lumbar spine, and right knee. (*Id.* at 656). Dr. Falco continued Teel on Oxycodone, but discontinued Flexeril. (*Id.*).

On August 11, 2011, Dr. Bandera submitted a Medical Source Statement on behalf of Teel. He opined that Teel could continuously sit, before alternating postures, for one hour, at which point Teel would need to walk about for about 15 minutes. (*Id.* at 730). He determined that Teel could sit for four hours during an eight-hour workday, could stand or walk about continuously and cumulatively for one hour, and would only need the normal morning, lunch, and afternoon break. (*Id.* at 731). Dr. Bandera determined that Teel would need to rest for one hour total in an eight-hour workday. (*Id.* at 732). He found Teel could constantly lift and carry up to ten pounds, occasionally lift and carry up to twenty pounds, but never lift or carry more than twenty pounds, and that she could occasionally balance, but never stoop, and could constantly reach and handle. (*Id.*). Dr. Bandera concluded Teel would be absent from work twice a month due to her impairments. (*Id.* at 733).

On September 7, 2011, Teel was referred to Dr. Xing. (*Id.* at 736). Teel was evaluated on September 9, 2011 by the AdvanceXing Pain and Rehabilitation Clinic and diagnosed with low back pain, bilateral knee pain, fibromyalgia, depression/anxiety, and hypertension. (*Id.* at 738-39). Teel was seen at Dr. Xing's office on September 21, 2011. (*Id.* at 778). She was prescribed Kadian, and Oxycodone was reduced. (*Id.*).

10

On October 6, 2011, Teel underwent a right knee arthroscopy with partial lateral meniscectomy and chondral debridement of the trochlea. (*Id.* at 782-83). The postoperative diagnosis was right knee lateral meniscal tear and right knee chondral defect of trochlea. (*Id.* at 782).

## III.  Administrative Hearing

### A.  Claimant's Testimony

Teel was 37 years old at the time of the administrative hearing. (D.I. 11 at 60). She is 5' 9" and weighed approximately 240 pounds. (*Id.*). Teel has a driver's license, but at the time of the hearing was unable to drive due to recent knee surgery and, prior to the surgery, it was difficult for her to drive because of her mental status. (*Id.*). Teel completed the 11th grade and has past relevant work as a cashier, photocopier, mailroom clerk, customer service representative, fast food worker, and barista. (*Id.* at 62-66).

Teel testified that she is most limited by her mental problems. (*Id.* at 67-68). Her mental health treatment is ongoing, she is seen three times per month, and takes a number of medications including Prozac, Cymbalta, Lamictal, Tamaozapan, Xanax, and Ambien when needed. (*Id.* at 68). She does not "do any social activities," but she is able to interact in a normal fashion with physicians she sees so long as she is on her medication and is in therapy. (*Id.* at 69-70, 91). In addition, she attends her children's school events. (*Id.* at 70).

She has problems with her sleep and appetite and takes Ambien to sleep, as needed. (*Id.* at 71). Teel has memory problems and depends upon her husband to help her. (*Id.* at 72-73, 90). She can concentrate for fifteen to twenty minutes at a time. (*Id.* at 90). She has problems with anger and irritability and had just completed an anger management class. (*Id.* at 73.) Teel

11

testified that she has mood swings, paranoid thoughts, racing thoughts, sometimes hears and sees things, and has anxiety or panic attacks. (*Id.* at 73-74).

Teel testified that she has chronic pain in her legs and back and has been in pain management since 2008. (*Id.* at 75). Teel had breast reduction surgery to relieve back pain, but still has chronic pain and arthritis in the back and legs. (*Id.* at 76). Her back is better since the breast reduction surgery. (*Id.* at 78). She takes Kadian, Oxycodone, and muscle relaxers. (*Id.* at 77). She has shooting pain in the right leg, spasms and numbness. (*Id.*). On a scale of one to ten, the pain is at level five with medication and at level ten without medication. (*Id.*).

Teel continues with physical therapy for her left shoulder. (*Id.* at 78). She has tension, numbing, and gnawing pain in the left shoulder, every other day, and she is unable to lift her arm over her head. (*Id.* at 79). With medication the pain is around three to four on a scale of one to ten. (*Id.* at 80). The medication Teel takes causes shaking, bruising, and occasional headaches. (*Id.* at 82).

Teel testified that she had recently had right knee surgery and that she was in physical therapy. (*Id.* at 80-81). Once the right knee heals, she will undergo left knee surgery. (*Id.* at 81). Prior to knee surgery, Teel could walk five to six hours and could stand for about six hours. (*Id.* at 83). She must stand and move around after thirty minutes of sitting. (*Id.*). The heaviest she can lift is five pounds. (*Id.* at 84). She can bend at the waist, but not all the way down, and she cannot stoop to pick something up off the floor. (*Id.*). Teel is able to care for her personal hygiene but at times her daughter helps her get dressed. (*Id.*). She can make a sandwich and wash dishes. (*Id.* at 85). Prior to the surgery she drove to the store, did the grocery shopping,

12

and carried bags. (*Id.*). She is able to keep track of her money and pay bills. (*Id.* at 85-86). Teel spends most of a typical morning attending medical appointments. (*Id.* at 87).

## B. The Vocational Expert

At the administrative hearing, the ALJ asked the vocational expert to described Teel's prior relevant work. The vocational expert testified that Teel had worked as a cashier (light, unskilled), fast-food worker (light, unskilled), photocopier (light, unskilled), mailroom clerk (light, unskilled), customer service representative (sedentary, semiskilled), and barista (light, semiskilled). (*Id.* at 92). The vocational expert opined that a person performing this type of work would not have skills that would transfer to lower levels of exertion. (*Id.*).

The ALJ then asked the vocational expert to consider:

a hypothetical person who is approximately the claimant's stated age at onset, about 34 years, has an eleventh grade education, is able to read and write and do at least simple math, add, subtract. . . . working at a light level of exertion[] . . . This person would have limited pushing and pulling with the lower extremities, and with the upper left extremity. This person would have all postural occasional, but there would be no climbing of a ladder, a rope, or a scaffold. This person should avoid work overhead with the left arm, and ... should avoid concentrated exposure to vibration and hazards [such] as moving machinery and heights, . . . [and] limited to simple, unskilled work that would not be at a production pace . . . defined as low stress [and] only occasional changes in the work setting . . . . Do you feel that such a person could do any of the claimant's past relevant work, in your opinion?

(*Id.* at 92-93). The VE testified that such an individual could perform the cashier, photocopier, and mailroom clerk jobs. (*Id.* at 93).

The ALJ asked how the hypothetical would be affected if she added to it that there would be only occasional contact with co-workers and the public. The VE responded that it would eliminate the cashier and mailroom clerk position and that he was unsure how it would affect the photocopy position. (*Id.* at 94). The ALJ then asked the VE if she could identify any jobs at a

13

level of light exertion or sedentary exertion that would fit within the parameters of the hypothetical. (*Id.*). The VE identified several light exertional jobs such as packer, inspector, housekeeper and several sedentary jobs such as assembler, security guard, and inspector. (*Id.* at 94-95). When asked by Teel's attorney if a person who has difficulty maintaining concentration for more than twenty minutes could perform the packer job, the VE at first was unsure, and then testified that the work might be precluded. (*Id.* at 96). Similarly, the packer job would be precluded because of the more than occasional contact. (*Id.*). Finally, the VE testified that given the difficulties assuming Teel's lack of concentration, and the difficulties with having more than occasional contact, she might not be able to perform any of the mentioned jobs. (*Id.* at 97).

## IV. Standard of Review

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *see Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence does not mean a large or a considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Credibility determinations are the province of the ALJ. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). They should be disturbed on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001).

14

## V. Regulatory Framework

Within the meaning of social security law, a "disability" is the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." *See* 20 C.F.R. § 404.1505. The claimant bears the initial burden of proving disability. *See* 20 C.F.R. §§ 404.1512(a), 416.905; *Podeworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984). To qualify for disability insurance benefits, the claimant must establish that she was disabled prior to the date she was last insured. *See* 20 C.F.R. §§ 404.131, 416.912(a); *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five. *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to

15

determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (requiring finding of not disabled when claimant's impairments are not severe). If claimant's impairments are severe, at step three the Commissioner compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work.[3] *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listings, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any of the listings, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(d), 416.920(e).[4]

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating a claimant is not disabled if able to return to past relevant work). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating that a claimant is not disabled if the

---

[3]Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii-iii), 416.920(a)(4)(ii-iii).

[4]Prior to step four, the Commissioner must assess the claimant's RFC. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Commissioner of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)).

claimant can adjust to other work); *Plummer*, 186 F.3d at 428. As previously stated, at this last step the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See id.* In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC.]" *Id.* This determination requires the Commissioner to consider the cumulative effect of the claimant's impairments, and a vocational expert is usually consulted.

At step one, the ALJ found that Teel met the insured status requirements of the Social Security Act through December 31, 2013, and that she had not engaged in substantial gainful activity since the alleged onset date. At step two, the ALJ found that Teel has the severe impairments of obesity, depression, lumbar degenerative disc disease, and left shoulder impairment. At step three, the ALJ determined that Teel did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ determined that Teel had the residual functional capacity to perform light work, except that she would have limited pushing and pulling with the lower extremities and left upper extremity; should avoid overhead work with the left upper extremity; should avoid concentrated exposure to vibration and hazards; is limited to simple unskilled work; is limited to work that would not be at a production pace; is limited to work that is low stress; and should have only occasional contact with co-workers and the public. (D.I. 11 at 39). At step four, the ALJ determined that Teel was able to perform her past relevant work as a copier operator. (*Id.* at 46). In the alternative, at step five, the ALJ concluded that considering Teel's age, education, work experience, and residual functional capacity, there were

17

jobs that existed in significant numbers in the national economy that she could perform, directing a conclusion that Teel was not disabled from August 21, 2008, through the date of the decision. (*Id.* at 46-47).

## VI.  Whether the ALJ's Decision is Supported by Substantial Evidence

Teel filed her complaint *pro se*. Therefore, the Court must liberally construe her pleadings, and "apply the applicable law, irrespective of whether [she] has mentioned it by name." *Holley v. Department of Veteran Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999); *see also Leventry v. Astrue*, 2009 WL 3045675 (W.D. Pa. Sept. 22, 2009) (applying same in the context of a social security appeal). Teel seeks an award of benefits on the grounds that she is disabled. (*See* D.I. 14). In other words, Teel appears to contend that the Commissioner's decision is not supported by the substantial evidence of record. Conversely, the Commissioner contends that substantial evidence supports the ALJ's decision. (*See* D.I. 17, 18).

With regard to medical opinions, an ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence he rejects. *See Diaz v. Commissioner of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer*, 186 F.3d at 429 ("An ALJ . . . may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."). The ALJ detailed her reasons for:  (1) affording little weight to the opinions of Dr. Simon and treating physician Dr. Bandera; (2) affording some weight to the opinion of Dr. Lifrak; and (3) affording great weight to the opinions of the State agency medical and psychological consultants.[5]  (D.I. 11,

---

[5]The State agency consultants are not named by the ALJ. The ALJ referred to Dr. Simon and Dr. Lifrak by their first names (*i.e.*, Dr. Brian and Dr. Irwin).

Tr. 44-46). In addition, the ALJ discussed why she assigned little credit to the third party function report completed by Teel's sister. (*Id.* at 40).

The ALJ discussed much of the medical evidence in detail. With regard to Dr. Niaz, one of Teel's treating physicians, the ALJ referred to physician's orders found at Exhibit 10F. (*Id.* at 42). However, the ALJ's decision makes no reference to the "SOAP Notes" of Dr. Niaz dating from February 14, 2010 to June 24, 2010 found at Exhibit 30F, wherein Teel is treated for recurrent complaints of severe pain. (D.I. 12 at 744-77). Nor does the ALJ's decision mention Dr. E. Dale Latonn or refer to his treatment notes found at Exhibit 20F wherein he also treated Teel for recurrent complaints of severe pain from December 4, 2009 to June 2, 2010. (*Id.* at 556-67). Finally, the ALJ's decision states that Teel is now seeing Dr. Xing, but notes that Teel did not submit any medical records from Dr. Xing.[6] (D.I. 11 at 43). Dr. Xing is affiliated with the AdvanceXing Pain and Rehabilitative Clinic, and the record contains a progress note and an initial evaluation report found at Exhibit 31F by a Nurse Practitioner at the same clinic. (D.I. 12 at 778-80). All of these records concern Teel's treatment for her complaints of pain.

The ALJ needs to explain why she is rejecting probative medical evidence. *See Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Plummer*, 186 F.3d at 429; *see also Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981) ("Because . . . an [ALJ] cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.") While the ALJ may have reasons for not considering the foregoing medical records, she did not provide an explanation. The Court may not speculate on

---

[6]The ALJ's decision refers to the physician as "Dr. Zing."

her reasons for doing do. For this reason, the Court must remand the case for a clear and detailed explanation of the ALJ's reason for her failure to consider the medical records contained in Exhibits 20F, 30F, and 31F. *See Fargnoli*, 247 F.3d at 42 (courts should "vacate or remand a case where such an explanation is not provided").

The ALJ's discussion of Teel's marijuana use raises a concern about whether the ALJ made an improper speculative inference. An ALJ may not make "speculative inferences from medical reports." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (citations omitted). The ALJ's decision makes specific reference to two incidents of past marijuana use by Teel: one in February 2008 prior to Teel's alleged date of disability (August 21, 2008) and the other in October 2008 when Teel tested positive for marijuana. Teel testified that she has not used marijuana since 2008. (D.I. 11 at 82). Nonetheless, under the section that discusses Teel's history of depression, the ALJ stated, "the undersigned notes that the claimant's use of marijuana could exacerbate her symptoms and reduce the effectiveness of prescribed medications." (*Id.* at 41). The ALJ does not indicate what symptoms or medication she believes could have been affected by the two instances of marijuana use referred to in the record. There are no medical records to support the statement, and the ALJ does not explain how she came to this conclusion. Yet, it appears that this inference played a part in the ALJ's finding Teel's statements concerning her symptoms not credible. (*See* D.I. 11 at 44).

The ALJ was not convinced that Teel's impairments were preclusive of all work. In this regard, the ALJ stated, "regarding the claimant's depression symptoms, the claimant continues to receive medication and therapy, but she has never required hospitalization or inpatient mental health treatment." (D.I. 11 at 44). True, but the fact that Teel has never required hospitalization

20

or inpatient mental health treatment does not mean that her long-standing depressive disorder does not affect her ability to work. *See, e.g., Kuharski v. Colvin*, 2013 WL 3766576, at *5 (E.D. Cal. 2013) ("The fact that plaintiff had not been hospitalized for a psychiatric crisis does not mean that his treatment was 'conservative' or that he could function in a normal working environment."); *Finn v. Astrue,* 2013 WL 501661, at *5 (C.D. Cal. Feb.7, 2013) (lack of hospitalization was not a specific and legitimate reason for the ALJ to reject opined mental limitations); *Matthews v. Astrue*, 2012 WL 1144423, at *9 (C.D. Cal. Apr.4, 2012) ("Claimant does not have to undergo inpatient hospitalization to be disabled"). Indeed, although Teel has not been not hospitalized, she has been treated for a depressive disorder since at least October 2007, which includes therapy and medications. Nevertheless, the ALJ credited the opinions of the "State agency psychological consultants" that Teel could perform "simple routine unskilled jobs" that took into account her limitations.

Finally, the ALJ determined that Teel has the residual functional capacity to perform light work, except that she would have limited pushing and pulling with the lower extremities and left upper extremity; should avoid overhead work with the left upper extremity; should avoid concentrated exposure to vibration and hazards; is limited to simple unskilled work; is limited to work that would not be at a production pace; is limited to work that is low stress; and should have only occasional contact with co-workers and the public. The ALJ determined at step four, that Teel could perform her past relevant work as a copier operator. (D.I. 11 at 46).

The ALJ's decision states that Teel "testified that she performed this position at a sedentary[7]

---

[7]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

to light level[8] of exertion and this position does not require more than occasional contact with co-workers or the general public." (*Id.*). During the hearing Teel described the copier operator position as standing at a copier and bringing boxes to her station that weighed five to ten pounds. (D.I. 11 at 62). No testimony was provided by Teel that described her contact with co-workers or the general public. The ALJ, however, queried the VE on the issue. *See Lopez v. Commissioner of Soc. Sec.*, 270 F. App'x 119, 123 (3d Cir. 2008) (at step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ.). When the VE was asked whether the hypothetical person could perform Teel's past relevant work given the limitation of occasional contact with co-workers and the public, the VE responded, "I'm not sure [of] the circumstances of her photocopy position, how much interaction that she had in that position. She could have . . ." before the ALJ interrupted with "all right . . . there would be more than occasional." (D.I. 11 at 94). It is far from clear from the VE's testimony that Teel could perform her past relevant work given that the VE was unsure of the circumstances of the photocopy position. Indeed, the transcript makes it appear that the ALJ – at the hearing – recognized that the VE's testimony did not support a determination that Teel could perform as a copier operator. Of course, any judicial officer can change his or her mind about something upon reflection, but there does not appear to be any basis for doing so here. The substantial evidence

---

[8]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. *Id.* at § 404.1567(b).

of record does not support the ALJ's written determination that Teel could perform her past relevant position as a copier operator given the testimony of Teel and the VE.

The ALJ determined that Teel could perform simple routine unskilled jobs and that she "should have only occasional contact with co-workers and the public." (*Id.* at 39). After determining that Teel could perform her past relevant position as a copier operator, the ALJ made an alternative finding at step 5 that there were other jobs existing in the national economy that Teel could perform. (*Id.* at 46-47). In doing so, the ALJ relied upon the VE's testimony in response to her hypothetical that asked the VE to identify any jobs at a level of light exertion or sedentary exertion that would fit within the parameters of the hypothetical. The VE identified several light exertional jobs such as packer, inspector, housekeeper and several sedentary jobs such as assembler, security guard, and inspector. However, upon cross-examination, the VE testified that, assuming Teel's difficulty with lack of concentration and difficulty in having more than occasional contact, she would not be able to perform any of the mentioned jobs. This is particularly relevant given that the ALJ afforded great weight to the opinions of the State agency psychological consultants who determined that Teel has moderate difficulties in maintaining concentration, persistence or pace, yet the ALJ did not include this variable in the hypothetical posed to the VE. (*Id.* at 159, 175).

Reliance on an expert's answer to a hypothetical question will not constitute substantial evidence unless all credibly established limitations are included; remand is required where the hypothetical question is deficient. *Anderson v. Astrue*, 825 F. Supp. 2d 487, 498 (D. Del. 2011) (citations omitted). "A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

23

The hypothetical question failed to reflect all of Teel's impairments that were supported by the record.

Finally, the ALJ has an obligation under *Cotter v. Harris*, 642 F.2d 700, 704, (3d Cir. 1981), to provide a clear and satisfactory explanation of the basis of her decision. *See Orriols v. Commissioner of Soc. Sec.*, 228 F. App'x 219, 225 (3d Cir. 2007). In light of the ALJ's finding that Teel should be limited to occasional contact, Teel's testimony about her limited attention span (*see* D.I. 11 at 90), which I gather the ALJ rejected,[9] the State agency consultants' opinions that were given great weight that Teel had moderate deficiencies in maintaining concentration (*see id.* at 159, 175), a deficient hypothetical posed by the ALJ, and the VE's testimony on cross-examination that Teel would not be able to perform the jobs identified given the limitation of more than occasional contact and lack of concentration, the ALJ's determination that there were other jobs in the national economy that Teel could perform is not supported by substantial evidence.

For the reasons stated, the matter must be remanded for further proceedings.

## VII. New Evidence

Teel submitted additional medical records with her motion for summary judgment that were not before the ALJ when she rendered her decision. When a claimant submits evidence after the ALJ's decision, that evidence cannot be used to challenge the ALJ's decision on the basis of substantial evidence. *See Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). Pursuant to 42

---

[9]As is usual in disability opinions, the ALJ recites a lot of evidence, which is qualified by a statement that she rejects any evidence to the extent it is inconsistent with her conclusions. (D.I. 11 at 43-44). I gather that this is a fairly standard way for ALJs to write their opinions, *see Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012) (describing virtually the identical language as a "template"), but it makes it very difficult for a court tasked with reviewing the ALJ's determination to see how the ALJ "buil[t] a bridge," *id.* at 649, between the medical evidence and the RFC determination.

24

U.S.C. § 405(g), sentence six, this court may, however, order a remand based upon evidence submitted after the ALJ's decision, but only if the evidence satisfies three prongs: (1) the evidence is new; (2) the evidence is material; and (3) there was good cause why it was not previously presented to the ALJ. *Matthews*, 239 F.3d at 593.

Teel does not meet the required prongs. First, the evidence is not material to Teel's claim for benefits from August 21, 2008, the alleged onset date, through December 31, 2013, the date Teel was last insured as the new records are dated at a time after the disability period in question. "[A]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). Second, Teel provided no explanation, much less good cause, for her failure to present the records she filed in support of her motion for summary judgment. Hence, the Court finds no basis to remand pursuant to the sixth sentence of 42 U.S.C. § 405(g).[10]

## VIII. Conclusion

For the reasons stated, the Court grants Teel's motion for summary judgment, denies the Commissioner's motion for summary judgment, and remands the case for further proceedings consistent with this Memorandum Opinion.

An appropriate order shall issue.

---

[10]Teel has available the option of filing a new application should she believe the new evidence supports an award for DIB benefits. *See* 20 C.F.R. § 416.330(b).